1
2
3
4
5

CONNON WOOD LLP
NICHOLAS P. CONNON, State Bar No. 150815
nconnon@connonwood.com
ROBERT A. de By, *Pro Hac Vice* application pending
rdeby@connonwood.com
35 East Union Street, Suite C
Pasadena, California 91103
Telephone:    (626) 638-1750
Facsimile:    (626) 792-9304

6

Attorneys for Aldini AG

7

8                    **UNITED STATES DISTRICT COURT**

9          **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

10

11    *In re* Ex Parte Application of                  Case No.

12    ALDINI AG

13                        Applicant,

14

15    For an Order Pursuant to 28 U.S.C. § 1782
      Granting Leave to Obtain Discovery from
16    Silvaco Inc., for Use in Foreign
      Proceedings.

17

18

19

20                    **DECLARATION OF DANIEL BAUMSLAG**
              **IN SUPPORT OF EX PARTE APPLICATION FOR AN ORDER**
21           **PURSUANT TO 28 U.S.C. § 1782 GRANTING LEAVE TO OBTAIN**
                  **DISCOVERY FOR USE IN FOREIGN PROCEEDINGS**

22          Pursuant to 28 U.S.C. §1746, I, Daniel Baumslag, declare under penalty of perjury as

23    follows:

24          1.      Since 2014, I have been the Head of Debt & Equity Markets at Aldini AG.

25          2.      Aldini AG ("Aldini") is a Swiss boutique merchant banking firm.

26          3.      Aldini and its affiliates have in excess of US$3 billion under management and

27    invest in excess of €100 million per year in small/medium sized enterprises and publicly quoted

28

                                           1

1  companies.

2      4.     Aldini has several offices in Switzerland, and it has an office also in both

3  Liechtenstein and the British Virgin Islands.

4      5.     Aldini's website is found at: https://www.aldinicapital.com.

5      6.     I submit this Declaration in support of Aldini's Application seeking the Court's

6  permission to obtain discovery from Silvaco, Inc. ("Silvaco") and for an Order, pursuant to 28

7  U.S.C. §1782.

8      7.     I am the executive at Aldini responsible for coordinating and managing the firm's

9  legal proceedings in France against MBDA, Soitec and others in connection with their role in the

10  fraudulent acquisition of the assets and business of Dolphin Integration (listed on the Euronext

11  stock market with symbol: ADOL) and the destruction of that company, in which Aldini held a

12  strategic equity stake.  As the head of Aldini's internal ADOL Task Force, I report directly to the

13  firm's Board of Directors.

14      8.     I am familiar with the facts set forth in this Declaration, either from personal

15  knowledge or on the basis of documents that have been provided to me.  Insofar as the facts are

16  within my own knowledge, the facts and matters testified to are true to the best of my own

17  knowledge and belief.

18      9.     From July 2017 onward, Aldini acquired shares in Dolphin Integration until, by

19  mid 2018, Aldini had acquired 28,466 shares amounting to a strategic equity position of 2.12% in

20  Dolphin Integration.

21      10.    Aldini acquired its strategic equity stake because our analyses showed that

22  Dolphin Integration was significantly under-valued and thinly-traded, hence Aldini had decided

23  that it should pursue the possibility of an acquisition of Dolphin Integration based on it being

24  under-valued, the company's potential for growth, and its unique technology and intellectual

25  property portfolio.

26      11.    During January 2018, Dolphin Integration's market cap on the Euronext stock

27  exchange had exceeded €51,000,000.

28      12.    Based on Aldini's analysis of Dolphin Integration, including a DCF valuation and

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

1    peer company and industry comparisons, Aldini believed the true enterprise value of Dolphin

2    Integration to be in excess of €649,000,000.

3         13.    From our perspective, any financial issues that Dolphin Integration had

4    experienced were basically growing pains typical of many high-growth tech companies that

5    Aldini invests in and were minor compared to the company's financials and future earning

6    potential.

7         14.    Dolphin Integration's unique technology, designs, and services addressed both the

8    needs of the fast-growing technology consumer markets and those of various industrial sectors,

9    including the European defense industry.  Aldini's analysis showed that the consumer electronics

10   market was expanding rapidly, and Aldini saw that Dolphin Integration was well positioned to

11   benefit.

12        15.    I learned that MBDA had been a long-standing Dolphin Integration customer,

13   while Soitec needed Dolphin Integration's cutting-edge technology to participate in the exploding

14   'Internet-of-Things' market (*i.e.*, technology for consumer and other connected devices using

15   integrated circuits, optimized for very low energy consumption).  Dolphin Integration's research,

16   services, and products comprised and were based on intellectual property that others, including

17   MBDA and Soitec, did not have access to otherwise.

18        16.    I learned that in 2017, MBDA and Soitec had tried to acquire Dolphin Integration,

19   but that their efforts failed apparently because its founder Michel Depeyrot did not wish to step

20   aside as the company's president.

21        17.    Aldini believes that MBDA/Soitec then set out to wrest control of Dolphin

22   Integration from its shareholders, including Aldini, by subterfuge and fraud to obtain Dolphin

23   Integration's unique technology in order to integrate it into their own products.

24        18.    Aldini believes that Dolphin Integration's financial 'problems' that later led to the

25   reorganization and bankruptcy proceedings in France, during which MBDA and Soitec raided and

26   acquired Dolphin Integration's assets and business for a mere €200,004, were manufactured to

27   allow MBDA and Soitec to acquire all Dolphin Integration's assets in secret while keeping

28   competing bidders away.

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

19.     I mention below the main facts that led me to conclude that Dolphin Integration's financial predicament that ultimately led to the company's demise was manufactured.  That is to say, Aldini believes that Dolphin Integration's insolvency was entirely artificial and avoidable.  To put that in plain English, it was a sham and part of MBDA and Soitec's scheme to drive Dolphin Integration into an insolvency procedure to enable MBDA/Soitec to then secretly take over all the company's assets and business for next to nothing, and while blocking anyone else from being able to make a competing bid for the Dolphin Integration assets and business or the company.  Assets, a significant part of which, were then transferred to Silvaco in the United States.

20.     In January 2018, Dolphin Integration announced a 29% increase in sales revenue, and in April 2018 announced that sales revenue was "up 16% compared to last year" and that this "sharp increase reflects the desired inflection for product sales, which is driving sustainable growth for the company."  (Exhibits 3 & 4).  Thus, things were going very well for the company, according to what it told the market.

21.     Then, on June 6, 2018, Dolphin Integration issued a Press Release, titled "DOLPHIN INTEGRATION UPDATES ITS PERSPECTIVES FOLLOWING THE POSTPONEMENT OF AN IMPORTANT ORDER."  (Exhibit 5).  However, Dolphin Integration never revealed which order, for what or for how much money, and from whom.

22.     That Press Release stated further: "the corporate management of a historical customer . . . has decided to postpone one of its strategic programs."  Again, Dolphin Integration never revealed which "historical customer," or which "strategic program" was postponed or for how long.

23.     The Press Release stated: "the liquidity risk is increased" but mentioned that "[i]n order to overcome this situation . . . in the context of the authorization given to the Board of Directors . . . to carry-out a capital increase or bank financing, the company's initiatives are in process for strengthening its operating funds."

24.     As merchant bankers, Aldini knew that there was no reason why a company with the earning capacity of Dolphin Integration could not obtain debt financing or raise additional

4

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

equity.  Moreover, the Press Release assured us that the Dolphin Integration board had been tasked to do so.  Hence, Dolphin Integration's June 6, 2018 Press Release, despite its mysterious references to an important cancelled order, strategic programs, and an undisclosed long-term customer was not, purely in itself, of any great concern to me.  And Dolphin Integration's statement that it would "carry-out a capital increase or bank financing" seemed the logical solution to the purported order-related issue it said it had encountered.

25.     Nor did it appear credible or likely, given our financial analysis of the company and its earning potential and valuation, that the cancellation of any single order could suddenly tip Dolphin Integration into insolvency.

26.     Hence, from a corporate finance perspective, and based on Dolphin Integration's public statements, there was no reason for Aldini or me to suspect or anticipate that Dolphin Integration was at risk of going bankrupt, let alone that its assets might be put up for sale in an insolvency proceeding.

27.     On the contrary, as we were looking at Dolphin Integration as a takeover target, and because based on the information the company was publishing it appeared that the company would emerge even stronger, Aldini decided to further increase its equity position.

28.     However, I later learned that despite that Dolphin Integration's Press Release stated that the company was in need of a cash infusion, the Dolphin Integration Board of Directors had refused to raise capital by issuing shares or to arrange for additional bank financing. Apparently, despite the company's statement that the board had specifically been mandated to do so, it did not even try.  Dolphin Integration's board of directors did nothing and sat on its hands. Thus, purposefully acting directly contrary to what it had told the market it would do.  Thereby exacerbating a manufactured financial 'crisis' so as to provide, what in retrospect became apparent, a pretext and opening for a corporate raid by MBDA and Soitec.

29.     To the best of my knowledge, nothing was ever mentioned again publicly about the mysteriously disappearing "important order", cancelled "strategic program", or indeed who the "historical customer" was that purportedly had tipped Dolphin Integration into the financial abys that later was used to justify MBDA/Soitec's secret pre-pack take-over of the company's

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

asset and business for €200,004 while the market had valued the company at more than €50 million, and while our financial analysis showed it to be worth in excess of $649,000,000.

30.     On July 16 and 19, 2018, Dolphin Integration issued Press Releases and announced: "An observation period expiring in mid-January 2019 should be opened to allow the company to find the solutions to ensure the sustainability of its activities . . . the company will communicate any new stage of the procedure . . . The company aims to be a global player," without mentioning the MBDA/Soitec pre-pack take-over offer which we later learned had been completed already on July 6 and 13, 2018.  (Exhibits 6 & 7).

31.     Accordingly, Aldini and the stock market were given to believe that the Dolphin Integration board of directors would be using the period until January 2019 – half a year – to obtain debt and equity financing, to reschedule its debts, to address any liquidity issues and would emerge stronger: "a global player."

32.     The message that "the company will communicate any new stage of the procedure" was not lost on Aldini either, and we trusted and relied on that believing that any negative development or unexpected turn of events would be shared with the stock market as it was a publicly quoted company, and with the company's shareholders.

33.     One July 19 and 20, 2018, Mr. Thierry Boutin, who was a Dolphin Integration shareholder, repeatedly offered to inject €2.5 million cash into Dolphin Integration to help it to address what the company had made the market believe was a purely temporary liquidity issue.

34.     Dolphin Integration while acknowledging receipt of Mr. Boutin's messages, then purposefully ignored his offer of a cash injection.

35.     I also learned that other shareholders, including Mr. Gerbier, offered to put in an amount of money sufficient to avoid any insolvency situation for Dolphin Integration but these shareholders, too, were rebuffed.

36.     Hence, Dolphin Integration's board of directors was intentionally exacerbating the company's financial situation.

37.     MBDA and Soitec personnel who had taken seats on the Dolphin Integration board had access to inside information and, unbeknownst to Aldini or the market, Aldini believes fed

6

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

1  that information to their employers who had been secretly using that insider information to put

2  together a pre-pack take-over offer for all of Dolphin Integration's assets and business.

3       38.    While Dolphin Integration's shareholders, including Aldini, and the stock market

4  were kept in the dark – indeed, misled to believe that Dolphin Integration's board of directors was

5  using the period until January of the following year (2019) to raise financing – we later learned

6  that MBDA and Soitec, instead of waiting for Dolphin Integration to utilize that period, rushed

7  through their pre-pack offer during the summer vacation in France, while virtually the entire

8  country famously shuts down every August.

9       39.    Dolphin Integration issued and we received various misleading press releases,

10  suggesting that Dolphin Integration was working through its financial issues and would emerge

11  financially healthy.

12       40.    However, as it turned out, MBDA's director on Dolphin Integration's board of

13  directors had resigned in June 2018, in a blatant attempt to avoid running afoul of the French

14  legal prohibition against such insider dealing.

15       41.    Soitec's director on the Dolphin Integration board of directors stayed on, but

16  Soitec later argued that he was not there on behalf of Soitec but purely out of personal interest.

17       42.    As a result, a company with previous a market cap in excess of €50 million and a

18  valuation in excess of €649 million, was stripped of all its assets for a mere €200,004 while the

19  market and its shareholders – including Aldini – were misled to believe that its board of directors

20  was in the process of obtaining equity and debt financing.  A significant part of those assets was

21  then transferred to Silvaco in the United States.

22       43.    While presenting MBDA's 2018 results on March 19, 2019, Mr. Bouvier, who was

23  MBDA's President at the time of the takeover of Dolphin Integration's assets and business, stated

24  about MBDA's Dolphin Integration asset-strip that MBDA gaining control of "this kind of highly

25  technological skillset is not only a factor of French sovereignty, but of European sovereignty."

26  (Exhibit 8).

27       44.    Based on Mr. Bouvier's statements and the events set forth in this Declaration,

28  Aldini believes that MBDA conspired with Soitec and others to drive Dolphin Integration into

1  receivership in order to, furtively, grab the company's assets and business for a mere €200,004,

2  while at the same time preventing potential competing bidders, such as Aldini, from learning

3  about the opportunity.

4      45.    Mr. Bouvier admitted as much, when he stated with regard to the Dolphin

5  Integration take-over that his "objective is to avoid the takeover of this business by potentially

6  non-European, hostile players."  (Exhibit 8).

7      46.    I learned from numerous press reports and my research that MBDA had been

8  facing resistance from the United States when selling missiles and missile systems to foreign

9  powers such as Egypt.  And that one way for MBDA to evade those objections was to replace

10  U.S.-manufactured components with French technology.  The French Minister of Defence, Ms.

11  Parly had made this clear in her parliamentary testimony, also.  (Exhibit 9).

12      47.    Aldini, other potential acquirers, the company's shareholders, and Dolphin

13  Integration itself fell victim to a geopolitical power game in which France and MBDA were

14  trying to side-line the United States' defense industry.  MBDA's main competitors include:

15  General Dynamics Land Systems, Raytheon, General Dynamics Ordnance & Technical Systems,

16  Lockheed Martin, and Boeing.

17      48.    Aldini believes that Soitec, in contrast to MBDA's geopolitical and strategic

18  motives, as revealed by Mr. Bouvier and the French defence minister's testimony, was motivated

19  by straightforward commercial gain.  Soitec was richly rewarded for its assistance, once MBDA

20  achieved its strategic objection of sidelining the United States and its defense industry.

21      49.    Soitec's core business is closely related to Dolphin Integration's and makes use of

22  the technology developed by Dolphin Integration for use in consumer goods and technology.

23      50.    On the announcement of MBDA/Soitec's pre-pack take-over deal of Dolphin

24  Integration's assets, Soitec's share price shot up 7%, which means the stock market valued

25  Dolphin Integration's business and assets at approximately €251,000,000.

26      51.    Soitec's share in the pre-pack take-over was 60% because Soitec owned 60% of

27  the SPV Dolphin Design in which MBDA/Soitec placed Dolphin Integration's assets.  As a result,

28  Soitec on the day of the announcement of the deal gained approximately €150,000,000 in market

8

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

1   value on the announcement.

2        52.    Aldini believes that MBDA and Soitec falsely represented to the French Court that

3   there were no other interested buyers and that only €200,004 could be found for all the Dolphin

4   Integration assets combined.  Aldini believes that MBDA and Soitec falsely represented to the

5   French Court that MBDA/Soitec were not planning to break up Dolphin Integration, while all

6   along having plans to re-sell part of its assets at a substantial profit.  Aldini believes that MBDA

7   and Soitec did so in order to deceive the Court (and the French Public Prosecutor) into approving

8   the pre-pack take-over of Dolphin Integration's assets.

9        53.    The basis for my belief, in addition to the facts set out above, is that on May 5, 2017,

10   a Soitec employee became a director on the Dolphin Integration board, a Mr. José Beriot.

11        54.    June 20, 2017, a MBDA employee became a director on the Dolphin Integration

12   board, a Mr. Harold van den Bossche.

13        55.    On June 5, 2018, at the request of Dolphin Integration's Board, a reorganization

14   proceeding was opened by the President of the Commercial Court in Grenoble (*Tribunal de*

15   *commerce de Grenoble*) and the Court appointed Maître Sapin of the firm la Société

16   Administrateurs Judiciaires Partenaires SELARL ("AJ Partenaires") as the trustee in charge of a

17   reorganization.

18        56.    Article L. 642-3 of the French Commercial Code prohibits the corporate officers of

19   a company placed in judicial liquidation to make a take-over offer for the company or its assets,

20   either directly or through an intermediary.

21        57.    Art. L. 642-3 states:

22              "*Neither the debtor, in respect of any of his property, nor the de jure*

23              *or de facto manager of the legal person in liquidation, nor the*

24              *relatives or associated persons up to the second degree inclusive of*

25              *these managers or of the natural person debtor, nor the persons*

26              *having or having had the capacity of controller during the procedure*

27              *are allowed, directly or through an intermediary, to present an offer.*

28              *Likewise, these persons are prohibited from acquiring, within five*

9

*years following the sale, all or part of the assets included in this sale,*

*directly or indirectly, as well as from acquiring shares or equity*

*securities of any company having in its property, directly or*

*indirectly, all or part of these assets, as well as securities giving*

*access, within the same period, to the capital of this company.*

*[. . .]*

*Any act in violation of this article is annulled at the request of any*

*interested party or the public prosecutor, presented within three*

*years from the conclusion of the act.  When the act is subject to*

*publicity, the period starts from this.*"

58.     On June 5, 2018, the same day that this reorganization proceeding was ordered by the Court, MBDA's Mr. Van den Bossche resigned as a board director at Dolphin Integration.

59.     On July 6, 2018, Mr. Henri Berger (CEO of MBDA) filed an affidavit with the Commercial Court in Grenoble swearing that MBDA did not fall under the prohibition of Art. L. 642-3.  That same day, MBDA and Soitec filed a pre-pack take-over offer for all the assets and the business (*fond de commerce*) of Dolphin Integration.

60.     On July 13, 2018, MBDA and Soitec filed an updated pre-pack take-over offer for all the assets and the business (*fond de commerce*) of Dolphin Integration for a cash payment of only €200,004, without either MBDA, Soitec, the trustee or the Court having arranged for it to be published.

61.     On August 3, 2018, at Soitec's initiative, a Special Purpose Vehicle ("SPV") was created under the name Dolphin Design for the purpose of acquiring the Dolphin Integration business and assets.

62.     It was not until August 19, 2018, that Mr. Van den Bossche's resignation as a director of Dolphin Integration was announced in the official French Government gazette (*Bulletin officiel des annonces civiles et commerciales*, also known by the acronym "BODACC").  Only two days before the Commercial Court in Grenoble approved MBDA/Soitec's pre-pack take-over offer for all the assets and business of Dolphin Integration.  As a result, as far as third parties and Aldini

10

1    are concerned, legally Mr. Van den Bossche was a member of the Board of Directors of Dolphin

2    Integration until August 19, 2018.

3         63.    On August 21, 2018, the French Commercial Court in Grenoble, without any

4    advance warning, approved the pre-pack sale to MBDA and Soitec of all Dolphin Integration's

5    assets and its business for a mere €200,004 in cash.

6         64.    Mr. José Beriot (Soitec) remained on the Dolphin Integration Board throughout.

7    When this point was raised during a number of the French Proceedings, Soitec maintained that

8    Mr. Beriot sat on Dolphin Integration's Board of Directors not for Soitec but purely as a matter of

9    personal interest and Soitec argued that, as a result, it had not violated the legal prohibition

10   against fraudulent sales laid down in Article L. 642-3 of the French Commercial Code.

11        65.    Moreover, on November 12, 2020, Silvaco announced that it had acquired a

12   significant part of the Dolphin Integration assets, while Silvaco's French subsidiary had actually

13   been present in Court during the pre-pack take-over by MBDA and Soitec in August 2018.

14   Moreover, on April 20, 2021, Dolphin Design produced a copy of an announcement to Aldini's

15   French counsel that stated that Silvaco had bought the Dolphin Integration assets that Dolphin

16   Design had previously acquired.

17        66.    Once MBDA had accomplished its strategic objective, MBDA sold Soitec a

18   further 20% equity stake in Dolphin Design on November 13, 2020, increasing Soitec's holding

19   in Dolphin Design (and thus the Dolphin Integration assets) to 80%.  Leaving MBDA owning

20   20%.

21        67.    The day after, the transaction with Silvaco was made public and it became clear

22   Silvaco had acquired the Dolphin Integration memory compiler technology and standard cell

23   libraries.

24        68.    Aldini believes that Soitec all along had the objective to 'flip' the Dolphin

25   Integration memory compiler technology and standard cell libraries to Silvaco in the United

26   States.  Aldini also believes this deal is a sale in name only in that Soitec appears to be working

27   together with Silvaco to monetize that technology even today.

28        69.    The basis for my belief is that Carlos Mazure, Executive Vice-President of Soitec,

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

1   joined the Silvaco Board of Directors a mere four months before this transaction was announced.

2   (Exhibit 10).  As well as various statements made by Silvaco executives to the press, that show

3   that Mr. Mazure is going to play a coordinating role.  (Exhibit 2).

4        70.    Mr. Mazure is not simply a Soitec official to 'keep watch' over Silvaco's

5   monetization of the Dolphin Integration assets, he is a highly experienced scientist with an in-

6   depth understanding of semiconductor technology and more than 100 patents filed worldwide,

7   who has reportedly authored over 120 scientific papers.  (Exhibit 11).  Hence, Aldini believes the

8   transfer of the Dolphin Integration memory compiler technology and standard cell libraries to

9   Silvaco is part of a Soitec/Silvaco joint venture contemplated from the beginning.

10       71.    It is this fraud concerning the acquisition of the business and all assets of the

11  Euronext-listed company Dolphin Integration for €200,004 in cash, a public company with a stock-

12  market valuation in excess of €51 million as per January 2018, involving among other alleged

13  wrongful conduct (i) the violation of the prohibition found in Article L. 642-3 against insiders

14  acquiring the contested assets, (ii) the violation of the duty of loyalty and fiduciary duties of

15  company directors, (iii) the use of insider information, (iv) the misleading of the company's

16  shareholders and the stock market, and (v) the violation of numerous French criminal statutes and

17  stock market regulations, that gave rise to the current French Proceedings as well as the additional

18  French Proceedings being contemplated and in advanced stage of preparation.  And for use in which

19  Aldini is seeking discovery from Silvaco that has acquired the memory compiler technologies and

20  standard cell libraries from Dolphin Design.

21       72.    Accordingly, the discovery sought is crucial for Aldini in pursuing its proceedings

22  before the French courts, as well as several contemplated proceedings that Aldini's French

23  counsel is currently preparing.

24       **The Pending French Proceedings**:

25       73.    In connection with and in response to the above events, Aldini commenced the

26  following legal proceedings, which are currently pending in France and in which Aldini is

27  represented by its French counsel, Maître Cataldo Cammarata of the Paris-based law firm Squadra

28  Avocats:

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

a. French Supreme Court (*Cour de cassation*) – Aldini's disclosure motion against MBDA, appeal against the judgment affirming the lower court's reversal of its permission for seizure by the bailiff, assisted by the police, of evidence at the offices of MBDA;

b. French Supreme Court (*Cour de cassation*) – Aldini's appeal against the judgment affirming the lower court's denial of the pre-action disclosure proceeding against Maître Bruno Sapin and his firm AJ Partenaires, the original trustee in the reorganization proceeding of Dolphin Integration;

c. French Administrative Supreme Court (*Conseil d'Etat*) – Aldini's appeal against the Prime Minister/Ministry of Finance's abuse of power rejecting Aldini's request to repeal Articles R.661-2, R.661-3 and R.611-26-2 of the Commercial Code as well as Articles 643 and 586(3) of the Code of Civil Procedure insofar as they unconstitutionally limit access to the French courts for foreign parties.

d. French Court of Appeal in Grenoble (*Cour d'appel de Grenoble*) – Aldini's appeal against the judgment affirming the lower court's denial of the pre-action disclosure proceeding against Soitec and Dolphin Integration on the basis that Aldini had not yet produced sufficient evidence of fraud;

e. Commercial Court in Grenoble (*Tribunal de commerce de Grenoble*) – Aldini's third-party objection proceeding (*tierce opposition*) against the judgment lifting the injunction against the sale of Dolphin Integration's assets during the two years following the pre-pack take-over and against the denial of access to information concerning the lifting of the injunction prohibiting the sale of the Dolphin Integration assets.

**The Contemplated French Proceedings**:

74.     Aldini is contemplating bringing the following legal proceedings in France. Aldini has instructed its French counsel, Maître Cataldo Cammarata of the Paris-based law firm Squadra Avocats to prepare these contemplated proceedings. Mr. Cammarata and his colleagues have been working on these matters and the contemplated proceedings are in advanced state of preparation

13

and will be brought before the French Commercial Courts in Grenoble and Paris, the Office of Public Prosecutor (the *Procureur de la République*, also known as the '*ministère public*' or '*le parquet*'), and the Financial Markets Regulator (the *Autorité des Marchés Financiers*, also known by its acronym "AMF"), as follows:

   a. Commercial Court in Grenoble (*Tribunal de Commerce de Grenoble*) – Aldini's suit on the merits for the fraudulent asset stripping and destruction on Dolphin Integration against MBDA, Soitec, Mr. Antoine Bouvier (former President of MBDA), Mr. José Beriot (Soitec's Vice President of Public Affairs and a former member of the Board of Directors of Dolphin Integration), Mr. Harold van den Bosche (MBDA's Director Industrial Policy & Supply Chain Management and a former member of the Board of Directors of Dolphin Integration), and others;

   b. Commercial Court in Grenoble (*Tribunal de commerce de Grenoble*) – Aldini's corporate law violations and securities fraud proceeding against *inter alia* Dolphin Integration managers and directors, Soitec, and Dolphin Design;

   c. Commercial Court (*Tribunal de commerce*) – Aldini's pre-action disclosure proceeding against Mr. Antoine Bouvier;

   d. Commercial Court in Versailles (*Tribunal de commerce de Versailles*) – Aldini's pre-action disclosure proceeding against Mr. Henri Berger (CEO of MBDA);

   e. Commercial Court in Paris (*Tribunal de commerce de Paris*) – Aldini's pre-action disclosure proceeding against Mr. José Beriot;

   f. Commercial Court in Paris (*Tribunal de commerce de Paris*) – Aldini's pre-action disclosure proceeding against Mr. Harold van den Bossche;

   g. Commercial Court in Grenoble (*Tribunal de commerce de Grenoble*) – Aldini's pre-action disclosure proceeding against Michel Depeyrot (founder and former president of Dolphin Integration);

   h. Commercial Court in Lyon (*Tribunal de commerce de Lyon*) – Aldini's pre-action disclosure proceeding against Christian Dupont (former CEO of Dolphin

14

1    Integration and former President of Dolphin Design);

2        i.   Office of the Public Prosecutor – Aldini as complainant against any involved

3            party and in particular Soitec, MBDA, and Messrs. Antoine Bouvier, Henri

4            Berger, José Beriot, Harold van den Bossche, Christian Dupont, Thierry

5            Sommelet (President of Dolphin Integration), Paul Bourde (CEO of Dolphin

6            Integration);

7        j.   Financial Markets Regulator (*Autorité des Marchés Financiers*), AMF – Aldini

8            as complainant and victim/interested party in enforcement proceedings for

9            securities law violation affecting listed company Dolphin Integration.

10   **The Contemplated French Liability Proceeding on The Merits:**

11   75.    Aldini is contemplating and is preparing a lawsuit for the fraudulent asset stripping

12   and destruction on Dolphin Integration and for violations of French law.  (*See* this Declaration

13   *supra* at ¶74(a)).

14   76.    The claims include but are not limited to (i) violation of Art. L. 642-3 against insider

15   dealing, (ii) the securities statute violations, and (iii) the corporate and/or tort liability of Dolphin

16   Integration's managers, its directors, and any stakeholders for infringement of Arts. L151-1 *and*

17   *seq.* French Commercial code protecting corporate and business secrets, (iv) Arts. L 225-37, L 225-

18   251 et L 225-252 French Commercial code dealing with statutory and by-laws violation and

19   mismanagement torts, together with Arts. L225-20 of same code on corporate director's

20   representative liability and (v) the duty of loyalty directors and managers have to abide by, against

21   MBDA, Soitec, Mr. Antoine Bouvier (former President of MBDA), Mr. José Beriot (former

22   member of the Board of Directors of Dolphin Integration), Mr. Harold van den Bossche (former

23   member of the Board of Directors of Dolphin Integration), and others.

24   **The Contemplated French Securities Fraud Proceeding**:

25   77.    As part of and during MBDA/Soitec's pre-pack take-over of Dolphin Integration's

26   assets, the company issued numerous public information releases misleading the market, pretending

27   the company was dealing with a temporary cash shortage only, that it would continue operations,

28   and that its Board of Directors had been mandated and would be raising new equity capital as well

15

1    as bank financing, and made a significant number of other false and/or misleading statement.  (*See*

2    this Declaration *supra* at ¶74(b))

3        78.    Through these statements Dolphin Integration kept its shareholders, including

4    Aldini, and the markets in the dark as to the true state of affairs.  Namely, that the company was in

5    the process of selling off all of its assets and its entire business – including its unique intellectual

6    property and its subsidiary companies – to MBDA/Soitec (and, as has become clear last November,

7    to Silvaco) for a mere €200,004 while Dolphin Integration had a market cap in excess of €51

8    million.

9        79.    Aldini believes that the motive behind these misleading statements, and part of what

10    will show them to be false and misleading, was the cooperation between the buyers (MBDA, Soitec,

11    and Silvaco amongst themselves) and with Dolphin Integration, designed to ensure the sale of all

12    its assets took place secretly, while the shareholders, including Aldini, and market were lulled into

13    waiting for the company to raise cash and to continue its operations.  Long enough at least, in Mr.

14    Bouvier's words (the then President of MBDA), "*to avoid the takeover of this business by*

15    *potentially non- European, hostile players.*"

16        **The Contemplated French Pre-Action Disclosure Proceedings**:

17        80.    Aldini is contemplating and its French counsel has been preparing six additional

18    Art. 145 CPC pre-action disclosure proceedings against the individuals involved in the asset

19    stripping and destruction of Dolphin Integration, the associated fraudulent behavior, use of Trojan

20    Horse directors, abuse of inside information, and violations of French Art. L. 642-3.  (*See* this

21    Declaration *supra* at ¶74(c)-(h)).

22        81.    These proceedings are in an advanced stage of preparation.  Aldini's French counsel

23    has already completed the disclosure applications to the Court against Messrs. Beriot and Depeyrot,

24    while the others are in an advanced state of preparation.

25        82.    The need for and use of the evidence sought by Aldini from Silvaco in those

26    contemplated Art. 145 CPC proceedings is similar to the use that will be made of such discovery

27    in the pending Art. 145 CPC proceeding before the Court of Appeal in Grenoble (s*ee* this

28    Declaration *supra* at ¶73(d)).  The need and use of the discovery sought here in the French

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

1   proceedings is explained with particular emphasis on the French disclosure proceedings in the

2   Declaration of Aldini's French counsel, Maître Cataldo Cammarata, filed concurrently with this

3   Declaration.

4       **The Contemplated French Criminal Proceeding**:

5       83.     Aldini is contemplating filing a criminal complaint against any involved party and

6   in particular MBDA, Soitec, José Beriot, Harold van den Bossche, Christian Dupont, Thierry

7   Sommelet, Paul Bourde, Antoine Bouvier, and Henri Berger for having allegedly committed the

8   following crimes: Art. 314-1 of the French Penal Code ("Breach of Trust"), Art. 321-1

9   ("Concealment of Breach of Trust"), Art. L241-3 and Art. 242-6(3) & Art. 242-6(4) of the Code de

10  Commerce ("Offenses relating to Management and Administration"), complicity in same, and

11  conspiracy in furtherance of same.  (*See* this Declaration *supra* at ¶74(i)).

12      84.     Aldini has instructed its French counsel and the resulting criminal complaint is in

13  an advanced stage of preparation.  The use for the discovery and evidence Aldini is seeking to

14  obtain from Silvaco, and its ability to use the same in a French criminal proceeding, is explained in

15  detail in the Declaration of Aldini's French counsel, Maître Cataldo Cammarata, filed concurrently

16  with this Declaration.

17      **Contemplated Proceeding Before the French Financial Markets Regulator**:

18      85.     Aldini has also instructed its French counsel to prepare, file, and represent Aldini in

19  its complaint to be filed with the French Financial Markets Regulator (*Autorité des Marchés*

20  *Financiers*, "AMF") in connection with the false and misleading information provided by Dolphin

21  Integration – including by the company's directors, two of whom were employees of MBDA and

22  Soitec, respectively – that led to the company being stripped of all its assets, while it kept its

23  shareholders and the stock market in the dark.  (*See* this Declaration *supra* at ¶74(j))

24      86.     The discovery sought from Silvaco is relevant for use in that French regulatory and

25  disciplinary proceeding because, as a publicly listed company, Dolphin Integration was under an

26  obligation to publish any material event that could affect its share price, such as the sale of a

27  significant part of its assets, unique technology, and intellectual property to Silvaco.

28      87.     That the sale of Dolphin Integration's memory compiler technology and standard

17

cell libraries to Silvaco is a material event and, therefore, that the discovery sought is relevant for use in the French AMF proceeding, is indisputably demonstrated by the 7% increase in Soitec's share price on the announcement of by MBDA/Soitec's pre-pack take-over deal of Dolphin Integration's assets, the equivalent of a gain of €150,000,000 in Soitec's market-value.

**Use of the Discovery Sought in the Pending and Contemplated French Proceedings**:

88.     With the exception of the proceedings before the French Supreme Court (*Cour de cassation*) and the French Administrative Supreme Court (*Conseil d'Etat*), mentioned under paragraphs 73(a)-(c) above, all the other proceedings I mentioned above under paragraphs 73(d)-(e) and 74(a)-(j) enable and, in fact, require Aldini to submit evidence.

89.     In this respect, and in particular where it concerns aspects of French law enabling Aldini to use the discovery sought and requiring that it introduce evidence in the French Proceedings, I refer to the declaration by Aldini's French counsel, Maître Cataldo Cammarata, filed concurrently with this Declaration.

90.     Silvaco announced on November 12, 2020, that it had acquired the contested "*memory compiler technology and standard cell libraries of Dolphin Design*," thus revealing itself to be the mystery buyer of the contested assets and raising a number of evidentiary issues that will be elucidated by the discovery sought, and that are highly relevant in the pending and contemplated French Proceedings, among which:

   a.   Soitec's plan to sell the Dolphin Integration memory compiler technology and standard cell libraries to Silvaco, including but not limited to its conception, timing, conditions;

   b.   Silvaco's dealings with MBDA/Soitec in 2018 concerning the Dolphin Integration assets, while Silvaco's French subsidiary was present in court and MBDA/Soitec represented to the French Commercial Court in Grenoble that there were no other buyers besides MBDA/Soitec, that there was no time to look for other buyers, and that there was only €200,004 in cash on offer for the Dolphin Integration assets;

   c.   the actual price paid by Silvaco for *part of* the Dolphin Integration assets,

18

1    including any possible non-cash consideration, how it was calculated, and when

2    it was set or any side agreements or letters.

3    d.  the extent to which MBDA/Soitec were hiding the true nature of Silvaco as a

4    buyer, or its French subsidiary, from the French Court during the Dolphin

5    Integration bankruptcy proceeding;

6    e.  the extent to which the transaction between Silvaco and Soitec, or Silvaco and

7    Dolphin Design, and the related communications and documentation, reveal a

8    fraud on the French court being perpetrated in connection with the

9    MBDA/Soitec pre-pack take-over of those assets, the French bankruptcy

10    proceedings, and the resulting MBDA/Soitec asset strip and destruction of

11    Dolphin Integration;

12    f.  the extent to which in the transaction between Soitec and Silvaco, or Silvaco and

13    Dolphin Design, for the acquisition of part of the Dolphin Integration assets, or

14    during the period leading up to it and the negotiations, Silvaco received any

15    assurances, promises or guarantees from Soitec or others in case a French court

16    would reverse the approval of the sale or void the sale agreement for the Dolphin

17    Integration assets that Soitec or Dolphin Design sold to Silvaco, why, and how;

18    g.  the extent to which Soitec or anyone else promised to indemnify Silvaco for the

19    consequences of Soitec's role in the fraud alleged by Aldini in the French

20    Proceedings;

21    h.  the extent to which Soitec or anyone else promised to defend Silvaco against the

22    consequences of any participation in the fraud alleged by Aldini in the French

23    Proceedings;

24    i.  the extent to which during the Soitec/Silvaco or Dolphin Design/Silvaco

25    transaction or the negotiations leading up to it, Soitec, Dolphin Design, and

26    Silvaco discussed whether, and how, to withhold information about the

27    contemplated purchase by Silvaco from the French courts, the French Public

28    Prosecutor, the trustees, the market or the shareholders including Aldini;

19

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

j.   the extent to which, during the Soitec/Silvaco or Dolphin Design/Silvaco transaction or the negotiations leading up to it, Soitec and Silvaco discussed the risk that Soitec's role in the MBDA/Soitec fraudulent asset strip of Dolphin Integration may be exposed and who would bear the financial consequences if it affected the Soitec/Silvaco or Dolphin Design/Silvaco transaction;

k.   the extent to which, during the Soitec/Silvaco or Dolphin Design/Silvaco transaction or the negotiations leading up to it, Soitec, Dolphin Design, and Silvaco discussed the risk of criminal prosecution in France or elsewhere, or potential sanctions being imposed by a French court, in connection with the MBDA/Soitec asset strip and destruction of Dolphin Integration;

l.   the extent to which the documentation related to the Soitec/Silvaco or Dolphin Design/Silvaco transaction or any related NDA contains any confidentiality or secrecy clause(s) designed to prevent disclosure of information so as to protect MBDA/Soitec/Dolphin Design or any of the other participants in the asset strip and destruction of Dolphin Integration against potential criminal prosecution or regulatory sanctions, or perpetuated a fraud on the French Court during the Dolphin Integration bankruptcy proceeding, and also any other related documents such as any draft Letter Of Intent (LOI) or final LOI signed;

m.   the extent to which the documentation related to the Soitec/Silvaco or Dolphin Design/Silvaco transaction contains any indemnification clause(s) designed to protect MBDA, Soitec, Dolphin Design, Silvaco or any of the other participants in the asset strip and destruction of Dolphin Integration against the costs of defending against potential civil, criminal or regulatory consequences or liability;

n.   the timing of the communications, negotiations, and transaction between Soitec/Silvaco or Dolphin Design/Silvaco as it will reveal the extent of the collusion between MBDA/Soitec and Silvaco, as well as how MBDA/Soitec always intended to break up Dolphin Integration and that MBDA's/Soitec's

20

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782

1        promises to the French Court to safeguard employment in the Grenoble area,

2        which was the purported justification for the take-over and its judicial approval,

3        was a mere pretext deployed by MBDA/Soitec to effectuate their fraudulent

4        asset strip;

5    o.  the extent to which the Soitec/Silvaco or Dolphin Design/Silvaco transaction

6        was motivated by and designed to shield the Dolphin Integration assets acquired

7        by Silvaco from a future French judgment in the contemplated French liability

8        and damages proceedings for the fraud, asset stripping, and destruction of

9        Dolphin Integration being contemplated by Aldini, by placing those assets

10       beyond the jurisdiction of the French courts, and thus to isolate them from a

11       French judgment so as to complete the fraudulent asset strip.

12    **Statement of Truth**:

13    91.    In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the

14 foregoing is true and correct.

15                     Executed in Zürich, Switzerland

16                     on May 27, 2021

17

18

19                     DANIEL BAUMSLAG

20

21

22

23

24

25

26

27

28

DECLARATION OF DANIEL BAUMSLAG FOR DISCOVERY UNDER 28 U.S.C. §1782